**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| UNTIED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:18-cv-2288-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| PAUL EDWARD MASHNI; PEM | ) | |
| RESIDENTIAL, LLC; PEM REAL ESTATE | ) | |
| GROUP, LLC; FINISH LINE FOUNDATION | ) | |
| II, INC.; KIAWAH RIVER FARMS, LLC; | ) | |
| KIAWAH RIVER EXCAVATING & | ) | |
| EARTHWORKS, LLC; KRF XSL, LLC; SC | ) | |
| INVESTMENT HOLDINGS, LLC; and SC | ) | |
| INVESTMENT HOLDINS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ————————————————— | ) | |

The following matter is before the court on defendant Paul Edward Mashni

("Mashni"); PEM Residential, LLC; PEM Real Estate Group, LLC; Finish Line

Foundation II, Inc.; Kiawah River Farms, LLC; Kiawah River Excavating & Earthworks,

LLC; KRF XSL, LLC; SC Investment Holdings, LLC; and SC Investment Holdins,

LLC's (collectively, the "corporate defendants") (together with Mashni, "defendants")

motion for partial summary judgment, ECF No. 143, and motion for judgment on the

pleadings, ECF No. 167. For the reasons set forth below, the court denies the motions.

## I.  BACKGROUND

The government brings this civil enforcement action pursuant to the Clean Water

Act ("CWA") to obtain injunctive relief and impose civil penalties against Mashni and

the corporate defendants.  Mashni owns two multi-parcel sites on John's Island, South

Carolina, near the Stono and Kiawah Rivers.  The complaint refers to these sites as the

"Legareville Site" and the "Edenborough Site."  ECF No. 1, Compl.  According to the government, the corporate defendants are entities involved in the development projects, each of which is owned and operated by Mashni.  The government alleges that in preparing the sites for construction, defendants violated the CWA by discharging pollutants into the Kiawah and Stono watersheds and redistributing soil to fill federally protected waters.  According to the complaint, defendants' unlawful conduct began "in or about January 2017," id. ¶ 121, and continued up until the filing of the complaint, id. ¶ 37.

On August 17, 2018, the government filed this enforcement action against defendants, alleging CWA violations with respect to both the Legareville and Edenborough Sites.  Id.  On September 23, 2019, the government voluntarily dismissed its claim with respect to the Edenborough Site, leaving only the Legareville Site at issue.  ECF No. 50.  Since November 15, 2019, the government and defendants have jointly filed seven motions to stay the matter while engaging in efforts to resolve the dispute without further litigation.  ECF Nos. 67, 70, 72, 76, 84, 87, 89.  The court granted each motion.  Eventually, however, the parties' efforts to settle their disputes unraveled.  On September 22, 2020, counsel for defendants signed a consent decree prepared by the government, requested to withdraw his signature the next day, then reneged on that withdrawal.  Ultimately, on September 26, 2020, Mashni himself contacted counsel for the government, withdrawing his consent from the proposed consent decree once and for all.

On March 19, 2021, defendants filed a motion for partial summary judgment, seeking the court's ruling on a relevant and disputed issue of law.  ECF No. 143.  On

April 9, 2021, the government responded in opposition. ECF No. 154. On April 23, 2021, defendants replied. ECF No. 161. On April 30, 2021, defendants also filed a motion styled as a motion for judgment on the pleadings. ECF No. 167. The government responded in opposition on May 14, 2021, ECF No. 171, to which defendants replied on May 21, 2021, ECF No. 175. Days later, the government sought permission to file a sur-reply, ECF No. 176, which garnered a response, ECF No. 177, and a reply, ECF No. 178. The court held a hearing on the matter on June 22, 2021. As such, these matters have been fully briefed and are ripe for the court's review.

## II.  STANDARD

### A.  Summary Judgment

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there

is a genuine issue for trial." Id. at 249.  In so doing, the court must view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

"The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact."  Major v. Greenville Hous. Auth., 2012 WL 3000680, at *1 (D.S.C. Apr. 11, 2012).  Nevertheless, "when a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  Id. (quoting Fed. R. Civ. P. 56(e)).  The plain language of Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[C]onclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion."  Major, 2012 WL 2000680, at *1.

**B.  Judgment on the Pleadings**

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings."  Courts follow "a fairly restrictive standard" in ruling on 12(c) motions, as "hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense."  5C Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1368 (3d ed. 2011).  Therefore, "a Rule 12(c) motion for judgment on the pleadings is

decided under the same standard as a motion to dismiss under Rule 12(b)(6)." Deutsche Bank Nat'l Trust Co. v. I.R.S., 361 F. App'x 527, 529 (4th Cir. 2010); see also Massey v. Ojaniit, 759 F.3d 343, 353 (4th Cir. 2014) ("[W]e are mindful that a Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact."). Although they share a standard, a motion for judgment on the pleadings differs from a motion to dismiss in that the former allows the court to consider matters outside of the complaint, where the latter generally does not. In resolving a motion for judgment on the pleadings, the court may consider the pleadings and exhibits attached thereto, relevant facts obtained from the public record, and exhibits to the motion that are "integral to the complaint and authentic." Massey, 759 F.3d at 347.

When considering a Rule 12(c) motion for judgment on the pleadings, the court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. E.I. du Pont de Nemours & Co. v. Kolon Indus., 637 F.3d 435, 440 (4th Cir. 2011); see also BET Plant Servs., Inc. v. W.D. Robinson Elec. Co., 941 F. Supp. 54, 55 (D.S.C. 1996) ("[A] defendant may not prevail on a motion for judgment on the pleadings if there are pleadings that, if proved, would permit recovery for the plaintiff."). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). On a motion for judgment on the pleadings, the court's task is limited to determining whether the complaint states a "plausible claim for relief." Id. at 679. Although Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," "a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Instead, the

"complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).

### III.  DISCUSSION

#### A.  Motion for Partial Summary Judgment

##### 1.  A Brief History of "Waters of the United States"

Before delving into its merits, the court frames the defendants' motion for partial summary judgment by trudging through the convoluted history of the phrase "waters of the United States."  That the phrase lies at the very heart of this case is one of the precious few points on which the parties agree.  The story begins with the Clean Water Act itself.  The CWA establishes a comprehensive statutory scheme designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To that end, the CWA prohibits the discharge of any pollutant, including dredged or fill material, into navigable waters, unless those discharges are made pursuant to statutorily authorized permits.  33 U.S.C. § 1311(a) (emphasis added).  The relevant statute conclusively defines the term "navigable waters" as "waters of the United States" (or "WOTUS").  33 U.S.C. § 1362(7).  In short, CWA jurisdiction extends to all "waters of the United States."

The contours of the phrase "waters of the United States" and the extent of its congressionally authorized reach have, to put it mildly, been the source of much confusion and controversy.  See Sackett v. E.P.A., 566 U.S. 120, 132 (2012) ("The reach of the Clean Water Act is notoriously unclear.").  Relevant here, in 1986, the Army Corps of Engineers (the "Corps") promulgated regulations interpreting "waters of the United

States" as including: traditional navigable waters, interstate waters, and territorial seas; impoundments of jurisdictional waters; intrastate waters and wetlands, the "use, degradation, or destruction of which could affect interstate or foreign commerce;" tributaries of jurisdictional waters; and wetlands adjacent to jurisdictional waters that are not themselves jurisdictional. 33 CFR § 328.3(a)(1)–(7) (1986); Final Rule for Regulatory Programs of the Corps of Engineers, 51 Fed. Reg 41,206 (Nov. 13, 1986) (the "1986 Regulations").[1] In several cases since 1986, the Supreme Court has narrowed the breadth of the 1986 Regulations by rejecting the furthest reaches of their WOTUS definition as impermissible agency interpretations of the statutory language, pursuant to Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984). In 2001, for example, the Supreme Court held that "the text of" the phrase "waters of the United States" does "not allow" for a regulatory interpretation that includes "nonnavigable, isolated, intrastate waters" which do not actually "abut[] on a navigable waterway." Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers, 531 U.S. 159, 171 (2001) ("SWANCC"). As a result, the agencies narrowed their application of the 1986 Regulations to comport with Supreme Court jurisprudence.

In 2006, the Supreme Court again spoke on CWA jurisdiction in Rapanos v. United States, 547 U.S. 715 (2006) (plurality opinion). In that opinion, all Justices agreed that a permissible interpretation of the phrase "waters of the United States" may encompass some waters that are not navigational in the traditional sense, but the Court

---

[1] The Environmental Protection Agency ("EPA") (together with the Corps, the "agencies") promulgated nearly identical regulations two years later. See Clean Water Act Section 404 Program Definitions and Permit Exemptions – Section 404 State Program Regulations, 53 Fed. Reg. 20,764 (June 6, 1988).

split regarding the valid scope of the phrase's reach. Justice Scalia, writing for the four-justice plurality, held that a permissible construction could include "relatively permanent, standing or continuously flowing bodies of water" with a "continuous surface connection to" traditionally navigable waters but must exclude "wetlands with an intermittent, physically remote hydrologic connection to" traditionally navigable waters. Id. at 739, 742. This approach has become known as the "continuous surface connection test." Justice Kennedy, in concurrence, reasoned that "waters of the United States" may rightfully include those waters or wetlands that "possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." Id. at 759 (Kennedy, J., concurring in the judgment) (quoting SWANCC, 531 U.S. at 167). Commenters refer to Justice Kennedy's approach as the "significant nexus test."

After Rapanos, many circuit courts explicitly adopted one or both of the Scalia and Kennedy approaches. The Fourth Circuit, however, has left the question unresolved. Precon Dev. Corp. v. U.S. Army Corps of Engineers, 633 F.3d 278, 288 (4th Cir. 2011) (employing the significant nexus test based on party agreement and declining to address the validity of the continuous surface connection test). In 2015, the agencies promulgated the so-called "Clean Water Rule" in an attempt clarify the phrase "waters of the United States." Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015). This rule only spurred further confusion after several district courts enjoined it as invalid. The Clean Water Rule was effective in South Carolina for little more than a month. Once the Clean Water Rule was deemed invalid, the 1986 Regulations again provided the operative rules. In 2019, the agencies officially rescinded the Clean Water Rule and reinstated the 1986 Regulations pending

promulgation of a replacement definition.  Definition of "Waters of the United States" –
Recodification of Pre-Existing Rules, 84 Fed. Reg. 566,26 (Oct. 22, 2019).

In April 2020, the agencies promulgated the so-called "Navigable Waters
Protection Rule" ("NWPR"), which provided a new regulatory definition for "waters of
the United States."  The Navigable Waters Protection Rule: Definition of "Waters of the
United States," 85 Fed. Reg. 22,250 (April 21, 2020).  The NWPR redefined WOTUS to
include only: "traditional navigable waters; perennial and intermittent tributaries that
contribute surface water flow to such waters; certain lakes, ponds, and impoundments of
jurisdictional waters; and wetlands adjacent to other jurisdictional waters."  Id.  In other
words, the NWPR narrowed the definition of the statutory phrase "waters of the United
States" to comport with Justice Scalia's approach in Rapanos, thereby excluding from
CWA jurisdiction wetlands that have no "continuous surface connection" to jurisdictional
waters.  See State v. U.S. Env't Prot. Agency, 989 F.3d 874, 882 (10th Cir. 2021) (noting
that the NWPR "adher[es] more closely to the plurality opinion in Rapanos").  The
NWPR represents a clear departure from the "waters of the United States" definition
contained in the 1986 Regulations, which included wetlands, the "use, degradation, or
destruction of which could affect interstate or foreign commerce."  51 Fed. Reg 41,206.
The NWPR became effective on June 22, 2020.  85 Fed. Reg. 22,250 ("This rule is
effective on June 22, 2020.").

As the government notes, the NWPR has been challenged in 15 cases filed in 11
district courts across the country, including one in this District.  See South Carolina
Coastal Conservation League v. Regan, No. 2:20-cv-1687-BHH (D.S.C. 2020).  On the
first day of his presidency, President Biden issued an Executive Order, directing

all executive departments and agencies [ ] to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with [ ] important national [environmental] objectives, and to immediately commence work to confront the climate crisis.

Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis, 86 Fed. Reg. 7,037 (Jan. 20, 2021).  Currently, the NWPR remains in effect.  With that lengthy background in mind, the court turns to the defendants' motion for partial summary judgment.

## 2. Applicable WOTUS Definition – Liability Phase

In their motion for partial summary judgment, defendants request that the court determine which definition of "waters of the United States" will govern this case—the 1986 Regulations' definition or the NWPR.  Before approaching the substance of defendants' motion, the court must pause once more to determine the nature of their request.  Defendants "ask that the Court decide the applicable regulatory definition now, as a matter of partial summary judgment, rather than requiring parties to put on liability and remedy cases under both the 1986 WOTUS definition and the NWPR."  ECF No. 143 at 5.  Generally, the court may only enter summary judgment on a party's "claim or defense."  Fed. R. Civ. P. 56(a).  Defendants here seek a declaration of law on a disputed issue, not judgment with respect to a claim or defense.  Nevertheless, the court finds that it can—and should—resolve this dispute at this juncture for a few reasons.  First, it is well established that a district court possesses an "inherent" power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  Landis v. N. Am. Co., 299 U.S. 248, 254 (1936).  Resolving a significant issue of law that goes to the very heart of a case certainly serves those ends.

Obviously, the parties can better prepare for trial if they know the governing law. Leaving this issue unsettled would force the parties to litigate in the dark and unnecessarily expend resources on matters that may prove irrelevant.  Further still, the government consents to defendants' request that the court resolve this disputed issue of law.  ECF No. 154 at 8 n.4 ("The United States has no objection to the Court viewing the motion as a pre-trial motion.").  Finally, this court would not be the first to resolve a disputed issue of statutory interpretation prior to trial upon a party's request.  See United States v. Cinergy Corp., 384 F. Supp. 2d 1272, 1273 (S.D. Ind. 2005), aff'd, 458 F.3d 705 (7th Cir. 2006) (resolving motions for "partial summary judgment regarding the applicable [legal] test" for certain Clean Air Act violations).  Therefore, even though defendants' motion is not a true summary judgment motion, the court will resolve the question of law it presents here and now.[2]

Defendants ask the court to find that the NWPR's definition of WOTUS—the law currently in effect—should retroactively govern the issues in this case.  The government asserts that the 1986 Regulations' definition of WOTUS—the law in place at the time of defendants' conduct—governs.  In support of their positions, the parties present legal doctrines of equal validity that seem to be in direct conflict.  Defendants rely on the Supreme Court's statement that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."  Bradley v. Sch. Bd. of City of Richmond, 416 U.S. 696, 711 (1974); see also Sprouse v. Schweiker, 677 F.2d 1029, 1030 (4th Cir.

_____

[2] The court rejects defendants' alternative request to construe their motion as a motion to dismiss, given that defendants fall well short of presenting any ground that might warrant dismissal of any claims or parties.

11

1982).  In support of its position, the government relies on the "generally accepted axiom," <u>Kaiser Aluminum & Chem. Corp. v. Bonjorno</u>, 494 U.S. 827, 855 (1990), that "[r]etroactivity is not favored in the law" and, consequently, "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."  <u>Bowen v. Georgetown Univ. Hosp.</u>, 488 U.S. 204, 206 (1988).  For the reasons that follow, the court agrees with the government.[3]

As the Supreme Court has acknowledged, there exists an "apparent tension" in discerning the law applicable to defendants' motion.  <u>Kaiser</u>, 494 U.S. at 837.  The court starts from the axiomatic proposition, which has applied "without exception" throughout "the 19th and most of the 20th centuries," that "legislation is to be applied only prospectively unless Congress specifies otherwise."  <u>Id.</u> at 842 (Scalia, J., concurring) (collecting cases).  Even after <u>Bradley</u>, which—as the court discusses below—seems to retreat from that well-settled principle, the Supreme Court has forcefully reaffirmed the federal presumption against retroactivity time and time again.  <u>See, e.g.</u>, <u>Landgraf v. USI Film Prod.</u>, 511 U.S. 244, 272 (1994) ("Because it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations."); <u>see also</u> <u>Ward v. Dixie Nat. Life Ins.</u>

---

[3] As an initial matter, defendants' argument that the court must retroactively apply NWPR because it announces a "jurisdictional" decree doesn't hold water.  ECF No. 143 at 11.  To be sure, the court must retroactively apply newly announced "statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed."  <u>Landgraf v. USI Film Prod.</u>, 511 U.S. 244, 274 (1994).  But that doctrine only applies to laws affecting the court's <u>subject matter</u> jurisdiction.  <u>Id.</u> (stating that jurisdictional statutes, which "speak to the power of the court rather than to the rights or obligations of the parties," must be applied retroactively).  While the NWPR restricts the jurisdiction of the agencies under the CWA, it has no effect on the court's subject matter jurisdiction, i.e., its authority to hear this case.

Co., 595 F.3d 164, 172 (4th Cir. 2010) (collecting cases and describing the federal presumption against retroactivity as "among the most venerable of the judicial default rules," a "time-honored presumption," and a "rule of general application").

Nevertheless, in 1974 the Supreme Court dampened the force of this revered presumption in Bradley. There, the Court confronted whether an attorney's fees statute that became effective during the pendency of an appeal should apply retroactively to events that occurred prior to its promulgation. Bradley, 416 U.S. at 696. The Court answered in the affirmative, announcing that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." Id. at 711. Consequently, the court in Bradley applied the statute in question retroactively, finding that it evinced no "clear congressional intent" against retroactivity and that retroactive application would not result in "manifest injustice." Id. at 723. Creating even more confusion, subsequent Supreme Court cases continued to rely on the time-honored presumption against retroactivity notwithstanding the law announced in Bradley. See Bowen, 488 U.S. at 208 ("[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.").

After Bradley, then, Supreme Court jurisprudence simultaneously embraced the presumption against retroactivity and the directive "to apply the law in effect at the time [a court] renders its decision[.]" 416 U.S. at 711. The Supreme Court confronted this apparent paradox in 1990 in Kaiser. 494 U.S. at 827. There, Justice O'Connor, writing for the majority, found that the two doctrines can harmoniously coexist: "We need not in this case, however, reconcile the two lines of precedent represented by Bradley[ ]

and [Bowen] because under either view, where the congressional intent is clear, it governs." Id. at 837. Justice Scalia, writing in concurrence, disagreed, yearning for the court to reconcile the divergent doctrines:

> I regret that the Court has chosen not to resolve the conflict between two relatively recent cases saying that unless there is specific indication to the contrary a new statute should be applied retroactively absent "manifest injustice" and the many cases, old and new, which have said that unless there is specific indication to the contrary a new statute should be applied only prospectively. In the rules of construction that they announce, if not in the results they produce, these two lines of cases are not merely, as the Court confesses, in "apparent tension;" they are in irreconcilable contradiction, and have spawned Courts of Appeals opinions to match. Since the issue has been briefed and argued in this case, I would have taken the occasion to admit that the rule we expressed in [ ] Bradley was wrong, and to reaffirm the clear rule of construction that has been applied, except for these last two decades of confusion, since the beginning of the Republic and indeed since the early days of the common law: absent specific indication to the contrary, the operation of nonpenal legislation is prospective only.

Id. at 841 (Scalia, J., concurring) (internal citations omitted). Years later, in Landgraf, the Supreme Court reaffirmed Justice O'Connor's view:

> Although we have long embraced a presumption against statutory retroactivity, for just as long we have recognized that, in many situations, a court should "apply the law in effect at the time it renders its decision," even though that law was enacted after the events that gave rise to the suit. There is, of course, no conflict between that principle and a presumption against retroactivity when the statute in question is unambiguous.

511 U.S. at 273 (internal citations and emphasis removed).

Reconciling Bradley's square peg with Bowen et al.'s round hole, the Fourth Circuit employs a "three-step analysis" to determine "whether the presumption against retroactivity bars the application of a statute[4] in a given case." Ward, 595 F.3d at 172

---

[4] The presumption against retroactivity applies with equal force to regulations. See Bowen, 488 U.S. at 208 ("[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.").

(footnote added).  "First, a court must 'determine whether [the promulgating body] has expressly prescribed the [regulation]'s proper reach.'"  Id. (quoting Landgraf, 511 U.S. at 208).  If the court concludes that it has, the presumption against retroactivity does not apply.  Id.  "If, however, the [promulgating body] has not prescribed the [regulation]'s reach, a court must move to step two and 'determine whether the new [rule] would have a retroactive effect' if applied to the case at hand.  Id.  If the new rule would have retroactive effect, "the presumption is triggered," and it can only be overcome if there exists a "clear [ ] intent" from the rulemaking body that the rule should apply retroactively.  Id.  The court discusses each of the three parts in turn, finding that defendants' argument collapses at each.

At the first step, the court must determine whether the agencies expressly prescribed the reach of the NWPR.  The court should so find, for example, if the agencies "include[ed] an explicit provision stating that the statute governs lawsuits already initiated prior to its enactment."  Id. (citing Martin v. Hadix, 527 U.S. 343, 354 (1999)). "The standard for express prescription is 'a demanding one,' requiring prescription that is truly express and unequivocal."  Id. at 173.  Where the relevant rule "contains no [ ] express and unequivocal language specifying whether it applies to lawsuits filed before its enactment," the court should find that the agency has not expressly prescribed the rule's reach.  Id.  Such is the case here.  The NWPR contains no language that evidences a "clear intent" for it to apply to conduct committed prior to its enactment.  See 85 Fed. Reg. 22,250.  Defendants only point to the fact that the NWPR explicitly renders the old rules "inoperative."  Id.  The problem with defendants' argument is that the NWPR renders the old rules inoperative only with respect to future conduct.  Id.  ("[W]hen this

final rule becomes effective, . . . agency guidance documents . . . <u>will be</u> rendered inoperative) (emphasis added). This language does nothing to evince the agencies' intent to have the NWPR apply retroactively. In other words, the fact that a rule, upon its effective date, renders the rule it replaces inoperative is not indicative of retroactivity. Of course, all new rules render the rules they replace inoperative; such is the very nature of new rules. And the Fourth Circuit has explicitly rejected similar arguments, finding that a sufficiently express directive in favor of retroactivity must include "language more obviously targeted to addressing the temporal reach of" the rule. <u>Ward</u>, 595 F.3d at 173. Thus, the NWPR clearly fails to prescribe an express backwards-looking reach.

 The court's inquiry at the second step also weighs against applying the NWPR retroactively. This step requires the court to determine whether the new rule, if applied, would have retroactive effect. There is no doubt that the NWPR—were the court to apply it—could operate retroactively here. "A statute operates retroactively when it would attach new legal consequences to events occurring prior to its enactment." <u>Id.</u> The NWPR changes the definition of "waters of the United States" and thereby removes certain waters from CWA jurisdiction. Therefore, the NWPR would attach different legal consequences to certain conduct that occurred before the rule's enactment. Take, for example, the discharge of dredged material in 2017 into a body of water that the 1986 Regulations define as a "water of the United States" but that the NWPR now does not. If the court were to apply the 1986 Regulations—the law in effect at the time of the discharge—the legal consequence for the discharge would be liability under the CWA; if, however, the court were to apply the NWPR retroactively in that instance, there would be no legal consequence at all. Indeed, if the NWPR had no retroactive effect, defendants

would not be urging the court to apply it. Accordingly, the court finds that applying the NWPR would give it retroactive effect, which triggers the centuries-old presumption against retroactivity.[5]

"Having determined that the presumption against retroactivity is applicable to this case," the court now must determine, at the third step, "whether the presumption is overcome." Id. at 174. As the law makes clear, overcoming this presumption is no easy task. "To overcome the presumption against retroactivity, a legislature must clearly demonstrate an intent to apply the statute retroactively. This standard is undeniably high, requiring an expression of legislative intent that is obvious from the [rule]'s text." Id. Overcoming the presumption "demand[s] express words evincing an intent that it be retroactive or words necessarily implying such an intent." Id. (quoting Am. Nat. Fire Ins. Co. v. Smith Grading & Paving, Inc., 454 S.E.2d 897, 899 (S.C. 1995)). Indeed, "[t]he words used [in the statute must be] so clear, strong, and imperative that no other meaning can be annexed to them, or . . . the intention of the legislature [must be such that it] cannot be otherwise satisfied." Id. (quoting U.S. Fid. & Guar. Co. v. United States, 209 U.S. 306, 314 (1908)) (alterations in original).

---

[5] Defendants confuse the law at this step and thereby complicate the inquiry, stating that the second step requires the court "to see whether the statute is 'impermissibly retroactive[.]'" ECF No. 143 at 12. That is not the law. In Matherly v. Andrews, the Fourth Circuit uses the phrase "impermissibly retroactive" in discussing whether the court below erred by retroactively applying the relevant statute. 817 F.3d 115, 119 (4th Cir. 2016). Why defendants pull the word "impermissibly" from Matherly, bereft of any context, and present it as instructive with respect to the second step of the analysis here is beyond the court. There, the Fourth Circuit applied the familiar second step of the retroactivity analysis according to Fourth Circuit precedent, without any consideration of "permissibility." Id. ("[W]e must decide whether the statute would operate retroactively."). The court does the same here.

Here, the NWPR cannot overcome the presumption against retroactivity. For one, no agency language contained within the rule calls for retroactive application. See 85 Fed. Reg. 22,250. In fact, the language manifests an undeniable directive for the NWPR to apply prospectively. Id. ("Once effective, [the NWPR] replaces the rule published on October 22, 2019"). Even more damning, the NWPR, which was promulgated on April 21, 2020, set a forward-looking effective date of June 22, 2020. Id. ("This rule is effective on June 22, 2020."). As the Fourth Circuit has explicitly stated, "Courts have repeatedly held that the inclusion of an effective date is inconsistent with legislative intent to apply the statute retroactively." Ward, 595 F.3d at 175 (collecting cases); see also Landgraf, 511 U.S. at 257 ("A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date."). Thus, the NWPR falls woefully short of evincing a clear intent that it be applied retroactively.

The leading case in the Fourth Circuit on this issue, Ward, forecloses defendants' argument at every turn.[6] There, the defendants urged the court to apply a newly enacted South Carolina statute to conduct that occurred when a previous version of the statute was in effect. There, like here, the defendants failed at the first step of the Fourth Circuit's three-step test because the new rule lacked language "clearly delineating the time period to which [it] applies." 595 F.3d at 173. There, like here, the Court found at the second step that applying the rule would result in retroactive application because "it

---

[6] Inexplicably, defendants cite to several cases in the Fourth Circuit applying Ward's test but omit from their briefs Ward itself, the leading authority on the issue in this circuit. This omission only underscores the devastating impact of Ward to defendants' position. Ignoring binding precedent does not make it disappear.

would reach back to alter the legal consequences of those events taking place before the statute went into effect." Id. More of the same at the third step, where the Fourth Circuit determined that the rule's prospective effective date clearly indicated an intent that the rule be applied prospectively, not retroactively. Id. at 175. Like the defendants in Ward, defendants here "put up a fight at each of the three steps" of the Fourth Circuit's test but ultimately are left bruised and bloodied by the clear import of the law.

Defendants present one additional ill-fated argument on this front. They contend that the NWPR would not have a retroactive effect in this case because it merely "clarifies" the law rather than substantively changing it. Defendants are correct on the law: "where a new rule constitutes a clarification—rather than a substantive change—of the law as it existed beforehand, the application of that new rule to pre-promulgation conduct necessarily does not have an impermissible retroactive effect[.]" Hicks v. Fed. Bureau of Prisons, 603 F. Supp. 2d 835, 841–42 (D.S.C.), aff'd, 358 F. App'x 393 (4th Cir. 2009). But the validity of defendants' argument ends there. The NWPR constitutes a clear change to the substantive law, not a mere clarification. "In determining whether an amendment clarifies or changes an existing law, a court . . . looks to statements of intent made by the [body] that enacted the amendment." Brown v. Thompson, 374 F.3d 253, 259 (4th Cir. 2004). Here, the agencies' intent to change the substantive law by promulgating the NWPR, thereby radically altering CWA jurisdiction, cannot be earnestly doubted. The summary of the rule states that it "is the second step in a comprehensive, two-step process intended to review and revise the definition of 'waters of the United States.'" 85 Fed. Reg. 22,250. The NWPR does not clarify the 1986 Regulations; it "replaces" them, definitively changing the waters to which the CWA

applies.  Id. ("[T]his final rule replaces the recodified pre-2015 regulations, upon its

effective date.") (emphasis added).  Again, if the NWPR did not amount to a substantive

change in the law, defendants would not be urging the court so strongly to apply it to

their case.

Defendants attempt to muddy these waters by noting that the NWPR is a

"clarification" of the CWA's definition of the phrase "waters of the United States."  ECF

No. 143 at 22.  Defendants are correct that the NWPR, like the 1986 Regulations before

it, defines "waters of the United States" and thus, in some sense, "clarifies" that statutory

phrase.  But that is not the kind of clarification the law contemplates.  Retroactive

application of a rule is appropriate "where [the] new rule constitutes a clarification . . . of

the law as it existed beforehand."  Hicks, 603 F. Supp. 2d at 841 (emphasis added).

Accordingly, the relevant inquiry is whether the NWPR constitutes a clarification of or a

change to the law as it existed beforehand.  As the court explains in detail above, the

NWPR effected an undeniable substantive change to the law—it greatly narrowed the

scope of CWA jurisdiction by excluding wetlands that were previously covered under the

1986 Regulations.  The fact that the NWPR provides a new definition for the phrase

"waters of the United States" does not mean that it clarifies the law as it existed

beforehand.  The agencies' promulgation of the NWPR significantly altered the waters to

which the CWA applies.  Thus, there can be no doubt that the NWPR effected a palpable

change to the law as it previously existed.

Moreover, the clarify-versus-change inquiry is just another way of applying the

second step of the Fourth Circuit's three-step test, i.e., "whether the new [rule] would

have a retroactive effect.'"  Ward, 595 F.3d at 172.  The court in Hicks stated,

> Thus, the Court concludes that applying the regulation . . . would not have "retroactive effect," as that term has been defined by the Supreme Court. <u>Stated differently</u>, "where a new rule constitutes a clarification—rather than a substantive change—of the law as it existed beforehand, the application of that new rule to pre-promulgation conduct necessarily does not have an impermissible retroactive effect . . . ."

603 F. Supp. 2d at 842 (emphasis added) (internal citations omitted). Although defendants attempt to convolute this inquiry, the issue of whether a statute operates retroactively—and thus "changes" the law rather than "clarifies" it—is not a difficult question. <u>See</u> <u>Martin v. Hadix</u>, 527 U.S. 343, 357 (1999) ("The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment."). As the court has explained, now ad nauseum, application of the NWPR to this case would "attach new legal consequences" to defendants' past conduct. <u>Id.</u> The commonsense inquiry ceases there. For all these reasons, the court concludes that the presumption against retroactivity controls and the law in effect at the time of defendants' conduct—the 1986 Regulations, not the NWPR—governs this case.

The court is not alone in its reasoning or result. In <u>United States v. Acquest Transit LLC</u>, the defendants posited the very argument defendants assert here—that the court should apply the NWPR to their pre-NWPR conduct. 2021 WL 809984 (W.D.N.Y. Mar. 3, 2021). Like here, the defendants there specifically contended that the NWPR merely "clarified" the law, meaning that applying it would not run afoul of the presumption against retroactivity. <u>Id.</u> at *11. The Western District of New York, resembling this court, was not convinced.

> Review of the changes in the regulatory definition of the phrase "waters of the United States" noted above shows that the NWPR is not a mere clarification of the definitional rule. The NWPR effects substantive

changes. The NWPR replaced the 2015 rule[7] which attempted to meld the adjacent wetlands (from Justice Scalia's plurality) and the significant nexus analysis from Justice Kennedy where that former rule excluded wetlands from the significant nexus analysis. The NWPR drops the significant nexus analysis entirely, acknowledging that this was a departure from the Government's prior position, 85 Fed. Reg. at 22,291, and extends the definition of "waters of the United States" only to wetlands adjacent to another waterway. It eliminates the case-by-case analysis of any premise to determine if it was wetlands in the waters of the United States.

Id. (footnoted added). The district court there reached the very conclusion this court reaches: "Since [the NWPR] is creating new regulation and not construing what already [exists] by clarifying existing law, it cannot be applied retroactively." Id. at *12. In the criminal context, the Ninth Circuit faced the same issue and, pursuant to like rationale, also reached the same result:

> The [NWPR] represents a change in the law, which applies prospectively only and not to [the defendant's] case . . . . Nothing in the text of the regulation suggests retroactive application. To the contrary, it states that the new limits on what constitutes jurisdictional waters would "replace[ ] the recodified pre-2015 regulations, upon its effective date," and that determinations made under prior versions of the regulation would be preserved.

United States v. Lucero, 989 F.3d 1088, 1104–05 (9th Cir. 2021) (internal citations omitted). Thus, Acquest and Lucero strengthen the court's resolve to apply the 1986 Regulations here.

### 3. Applicable WOTUS Definition – Penalty Phase

Defendants also argue that even if the NWPR does not govern the liability phase of this case, it must necessarily govern the penalty phase because "any relief that will

---

[7] There, the court analyzed the NWPR as it compared to the 2015 Clean Water Rule. Those regulations are not at issue here because they were not effective in South Carolina when defendants engaged in the allegedly unlawful conduct. Nevertheless, the rationale of the Western District of New York is persuasive, given that the NWPR effected similar changes to both the 1986 Regulations and the 2015 Clean Water Rule.

operate prospectively must be governed by reference to current law." ECF No. 143 at 30. As an initial matter, the government agrees that current law will govern any injunction that enjoins future conduct in this case. ECF No. 154 at 22 ("[T]he United States only seeks to enjoin future conduct that is not in compliance with the [CWA] . . . . The statutory and regulatory provisions that are in effect at the time of any future conduct would clearly govern that conduct."). Thus, the NWPR will govern any injunctive relief that issues in this case.

The same cannot be said for the imposition of monetary penalties or other "appropriate relief." 33 U.S.C. § 1319(b). Defendants argue that "this Court should consider the scope of WOTUS under current law when setting a monetary penalty." ECF No. 143 at 31. But defendants fail to explain why the court would determine liability according to one law and determine damages according to another, or how it could do so. The court in <u>Acquest</u> was similarly befuddled by the proposition:

> The power of the EPA to regulate activity . . . and then to sanction Defendants for violation of those regulations is pursuant to the same regulatory standards. If Defendants violated CWA regulations in 2007, the penalty should not be determined by the standard of 2021 (absent the regulations so providing), especially if that 2021 standard would not hold any violation occurred. It would be a wasteful exercise of overtaxed judicial resources to conduct liability jury trial under the 2007 version of regulations then conclude no penalty arose therefrom under 2021 standards.

2021 WL 809984, at *12. That logic applies here. If defendants violated the law in 2017 and 2018, they should face penalties under the law as they existed then. To hold that the presumption against retroactivity applies to liability but not to penalty would undermine the presumption entirely. Thus, the definition of "waters of the United States" contained in the 1986 Regulations, not the NWPR, applies to the imposition of penalties in this case, if any are imposed at all.

**B. Motion for Judgment on the Pleadings**

Defendants have also filed a motion which they label as a "motion for judgment on the pleadings or, alternatively, for summary judgment or dismissal as to certain claims, defendants, and relief." ECF No. 167. In this motion, defendants request that the court "right-size" the issues for trial by seeking summary judgment on or dismissal of the following "claims":

> (I) any in rem claims against parcels of property as such;

> (II) any in personam claims against prospective purchasers if those persons had no involvement in the alleged unpermitted activities in this case;

> (III) any claims for relief that are directed against parcels as such and/or third-party purchasers of parcels (instead of against the named Defendants themselves);

> (IV) any claims for relief in the form of a mandatory payments [sic] to third parties for "mitigation bank credits," . . . ;

> (V) any claims as to PEM Residential, LLC and PEM Real Estate Group, LLC which have no involvement in the alleged violations; and

> (VI) any claims for impacted jurisdictional wetlands that exceed the 14.92 acres set forth in the Government's own expert report (including the purported additional 3.7 acres comprising 18.6 acres of impacted jurisdictional wetlands alleged in the complaint).

Id. at 3–4. The court discusses each in turn, finding that none warrant court action.

**1. Claims Against Property and Third Parties**

Because defendants' first three requests are closely related and fail for the same reasons, the court discusses them together. Before unpacking these requests, the court briefly discusses the relevant law. The CWA clearly authorizes the court to order a liable defendant to restore the wetlands into which it discharged pollutants. The CWA grants courts broad discretion to order all "appropriate relief" for any violations, "including a

24

permanent or temporary injunction." 33 U.S.C. § 1319(b). The Fourth Circuit, in accordance with the unanimous approach, holds that "appropriate relief" may include ordering a defendant to restore affected waters. United States v. Deaton, 332 F.3d 698, 714 (4th Cir. 2003); see also United States v. Cumberland Farms of Connecticut, Inc., 826 F.2d 1151, 1164 (1st Cir. 1987) ("[T]he district court had authority to issue [ ] restorative orders so as to effectuate the stated goals of the [CWA]."). Indeed, defendants concede that a proper remedy in this case may include "a court order requiring some form of restoration." ECF No. 167 at 16. Accordingly, there is no dispute that the court may order restorative relief, which could, among other things, require defendants to restore the impacted wetlands. With that undisputed legal reality in mind, the court turns to defendants' first three requests.

Defendants ask the court to grant summary judgment upon or to dismiss "any in rem claims against parcels of property" and "any in personam claims against prospective purchasers." Id. at 4. In the same vein, defendants request that the court resolve "any claims for relief that are directed against parcels as such and/or third-party purchasers of parcels." Id. There are several reasons to reject these requests. Most fundamentally, the government has not asserted "any in rem claims against parcels of property" or "any in personam claims against prospective purchasers" upon which the court could grant summary judgment. The CWA prohibits the discharge of pollutants "by any person," 33 U.S.C. § 1311(a) (emphasis added), and likewise authorizes the court to impose penalties against violating "person[s]," id. § 1319(a) (emphasis added). Accordingly, the

government has asserted claims against the "persons"[8] it alleges violated the CWA, i.e., defendants. Compl. The government simply has not asserted any "in rem" claims against the relevant property or "in personam" claims against prospective purchasers of that property, and there is no indication that it could. Therefore, defendants do not seek to resolve any claims; they seek a court declaration as to an undisputed point. Principles of Article III justiciability prevent the court from issuing a declaration in the absence of a true "case or controversy." See Zahn v. Barr, 2020 WL 3440801, at *2 (D.S.C. June 23, 2020). Indulging defendants' request would produce an advisory opinion on an issue not in dispute.

In addition to being unnecessary, the declaration defendants seek has the potential to be misconstrued and thus misleading. Defendants make explicit that a purpose of their requests (if not the purpose) is to assist Mashni in selling the property on which the alleged discharges occurred. As defendants explain, "prospective purchasers are often wary of entanglements with the Government if they acquire any of the twenty parcels identified in the complaint." ECF No. 167 at 7. Defendants seek a declaration from the court to ease the minds of prospective purchasers, so that Mashni might "sell all of [his] remaining parcels to willing buyers and exit the area." Id. at 9. Of course, defendants are correct that this lawsuit does not involve claims against property or prospective purchasers. Nevertheless, the court is wary of issuing a declaration stating as much because it could be misinterpreted. While this lawsuit includes no claims against the relevant property itself, the CWA clearly authorizes the government to seek—and the

---

[8] "The term 'person' means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

court to order—restorative injunctive relief, which may require defendants to restore the wetlands on which they allegedly discharged pollutants and/or fill material. Therefore, the eventual relief ordered in this case may very well affect the impacted properties. A declaration from the court that there exists no claims against the relevant property could be misconstrued as a finding that this lawsuit will never impact the relevant property, which is not the case. Thus, in the absence of any true dispute between the parties on this point, the court is without reason—and possibly without constitutional authority—to issue a declaration that might tend to confuse more than it clarifies.

In sum, there is no reason the court to issue a declaration on an uncontested issue. The government is not asserting any claims against the impacted property or prospective purchasers. And the government is seeking only that relief which the law authorizes, such as a court order directing defendants to restore the affected wetlands. Put simply, there is nothing for the court to do here. The fact that prospective purchasers of Mashni's land may be wary of buying property that is the subject of a CWA enforcement action is not an issue that the court can resolve. For these reasons, the court declines to indulge the first three requests in defendants' second motion.

### 2. Mitigation Bank Credits

Next, defendants argue that the court cannot require "defendants to pay money to [ ] third parties for 'mitigation banking credits' for activities at other properties[.]" ECF No. 167 at 18. The government, of course, argues that the law does authorize courts to order the payment of mitigation bank credits. Because defendants' request puts the cart well before the horse, the court rejects it.

As the court discussed above, the CWA grants courts broad discretion to order all "appropriate relief" for any violations. 33 U.S.C. § 1319(b). In the Fourth Circuit, courts consider three factors to determine whether a remediation or restoration proposal is appropriate: "(1) whether the proposal would confer maximum environmental benefits, (2) whether it is achievable as a practical matter, and (3) whether it bears an equitable relationship to the degree and kind of wrong it is intended to remedy." Deaton, 332 F.3d at 714 (quoting Cumberland Farms, 826 F.2d at 1164) (internal quotation marks omitted). A "mitigation bank credit" is a credit purchased for the restoration of wetlands unrelated to the affected properties. 33 C.F.R. § 332.2. Very few published opinions address the appropriateness of mitigation bank credits as a restorative remedy. Some courts have considered them appropriate. Foster v. United States Env't Prot. Agency, 2019 WL 4148067, at *1 (S.D.W. Va. Aug. 29, 2019) ("Compensatory mitigation can be accomplished in one of three ways: 1) mitigation banks, 2) in-lieu fee programs, or 3) permittee-responsible mitigation, with the use of mitigation banks being the preferred method."); United States v. Bedford, 2009 WL 1491224, at *14 (E.D. Va. May 22, 2009) ("Other forms of remediation are compensatory mitigation, such as purchasing credits at a mitigation bank to accomplish off-site creation of wetlands."). Other courts, in certain circumstances, have found them inappropriate. United States v. Smith, 2014 WL 3687223, at *9 (S.D. Ala. July 24, 2014) (finding compensatory mitigation inappropriate where "no permits were involved and an exemption applied").

It would make little sense to resolve the issue here and now. For one, the court has yet to determine liability in this case, meaning that any discussion of appropriate penalties is premature. More importantly, even if the court wanted to resolve this issue

now, doing so would be nearly impossible as a practical matter.  The court has almost no information from which it might determine the appropriateness of mitigation bank credits under the Fourth Circuit's three-factor test.  For example, the court has no evidence demonstrating the environmental benefits of such a remedy, whether the remedy is achievable, or whether it properly reflects the wrongful conduct (which, of course, has yet to even be adjudicated as wrongful).  The case law makes clear that this inquiry is complex and fact intensive.  See, e.g., United States v. Weisman, 489 F. Supp. 1331, 1348 (M.D. Fla. 1980).  In the absence of any evidence, the court has no basis from which it might reach a conclusion on this issue.  Therefore, there is no good reason at this point for the court to hold that mitigation bank credits are definitively appropriate or inappropriate as a remedy here.  This is an issue for the penalty phase of litigation.

### 4. The PEM Defendants

Next, defendants ask that the court dismiss from the case, or grant summary judgment in favor of, two defendants: PEM Residential, LLC and PEM Real Estate Group, LLC (the "PEM Defendants").  According to defendants, "After three years of litigation, the government has failed to obtain any evidence to support its allegations of liability against [the PEM Defendants]."  ECF No. 167 at 21.  In response, the government offers the very evidence defendants claim it lacks.  Therefore, neither dismissal nor summary judgment is inappropriate.

As the court discussed above, the CWA prohibits the discharge of pollutants "by any person," 33 U.S.C. § 1311(a), a defined term that includes individuals, corporations, partnerships, and associations, 33 U.S.C. § 1362(5).  Courts have held that the CWA applies to both "the party who actually performed the work and on the party with

responsibility for or control over performance of the work." <u>Assateague Coastkeeper v. Alan & Kristin Hudson Farm</u>, 727 F. Supp. 2d 433, 442 (D. Md. 2010) (quoting <u>United States v. Lambert</u>, 915 F. Supp. 797, 802 (S.D.W. Va. 1996) and collecting cases).

The government has presented evidence from which a reasonable jury could find the PEM Defendants liable under the CWA. For example, the government has submitted emails from the Chief Operating Officer of PEM Real Estate Group, LLC, indicating that he approved the expenditure of funds for survey work at the Legareville Site. ECF No. 171-26. Further, the government explains that "Kiawah River Excavating & Earthworks, LLC's equipment was also included on PEM Real Estate Group, LLC's 2017 and 2018 profit and loss statements, and PEM Real Estate Group, LLC and Kiawah River Excavating & Earthworks, LLC have a tax relationship." ECF No. 171 at 13 (citing ECF No. 171-29, Gardier Depo. 119:24–123:7). The government also notes that "PEM Residential, LLC, is also directly linked to Defendant Kiawah River Excavating & Earthworks, LLC and its heavy equipment operators." <u>Id.</u> (citing ECF No. 171-28). Additionally, the government has produced several emails indicating that Mashni, in his capacity as Chief Executive Officer of PEM Real Estate Group, LLC, invoiced some of the work done at the Legareville Site. ECF No. 171-24. In short, the government has done more than enough to create a genuine issue of fact as to whether the PEM Defendants had a "responsibility for or control over [the] performance of the work" at the Legareville Site and thus can be held liable for violations of the CWA. <u>Assateague</u>

<u>Coastkeeper</u>, 727 F. Supp. 2d at 442.[9]  Therefore, the court has no difficulty concluding that summary judgment is not appropriate here.[10]

### 5. The 3.7-Acre Disparity

Finally, defendants ask for summary judgment with respect to 3.7 acres of property.  Defendants note that the government's complaint alleges "approximately 18.6 acres" of impacted jurisdictional wetlands, Compl. ¶ 22, yet the government's own wetland expert testified that only 14.92 acres of jurisdictional wetlands were impacted by defendants' activities, ECF No. 167 at 22.  In response, the government explains:

> In the Complaint filed in 2018, prior to when the United States' wetlands expert was able to assess the Legareville Site, the United States alleged that Defendants operated mechanized earthmoving equipment "in approximately 18.6 acres of waters of the United States (e.g., tidally[ ]influenced marsh and adjacent wetlands) at the Legareville site, collectively."  After the United States' wetlands expert conducted a careful site investigation over a period of three days and considered other materials such as mapping and aerial photography, he concluded that 14.92 acres of jurisdictional wetlands were impacted.

---

[9] In reply, defendants attempt to undermine the government's proffered evidence and then posit that summary judgment is appropriate because the government "has presented insufficient evidence to show [that the PEM Defendants] actually discharged or otherwise controlled or were responsible for those discharges[.]"  ECF No. 175 at 9. Defendants have it backwards.  It is the party moving for summary judgment that has the burden to produce evidence demonstrating that summary judgment is justified.  <u>Major</u>, 2012 WL 3000680, at *1 ("The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact.").  Nevertheless, defendants attach no exhibits to their motion and fail to cite to a single scrap of evidence that might justify resolving the government's claims against the PEM Defendants.  The government, on the other hand, has presented relevant evidence supporting its claims against the PEM Defendants.

[10] Because the court determines that the government has created a genuine issue of material fact as to the PEM Defendants' involvement in the allegedly unlawful activity through the evidence it presents in response to defendants' motion, the court need not consider the additional evidence the government presents in its proffered sur-reply, ECF No. 176.  Therefore, the court denies the motion to file sur-reply as superfluous to its resolution of defendants' motion.

ECF No. 171 at 34 (internal citations omitted).  In other words, the government alleged violations covering 18.6 acres, and then gathered evidence demonstrating that the violations actually covered 14.92 acres.  It seems clear that the government will only move forward with its evidence that violations occurred on 14.92 acres of the relevant property, and, based on the parties' indications at the hearing, it is the court's understanding that they will enter into a stipulation establishing as much.  There are no grounds for summary judgment here.  Accordingly, the court denies both of defendants' motions in full.

## IV.   CONCLUSION

For the foregoing reasons the court **DENIES** defendants' motion for partial summary judgment, ECF No. 143, and motion for judgment on the pleadings, ECF No. 167.

      **AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**July 1, 2021**
**Charleston, South Carolina**